Our case numbers are 23-13085 and 23-13095 We're going to take the cases separately, so we're ready to begin with the first one, Mr. Petrano. Thank you, Your Honor. May it please the Court that I present to you, Mr. Petrano, the case number 23-13085. Giving a gift to someone standing in line is pure conduct. It's not an inherent symbol that an objective, reasonable observer would understand as expression. But the Court can also just skip that question. How do you square that with food not for bombs? Yeah, I think that this case is different in almost every way than food not bombs. First of all, food not bombs made clear that these should be as-applied challenges, that you're almost never going to have this kind of conduct regulation as a facial challenge. So at the very least, we should win on that point. But also, food not bombs is talking about a communal meal. And, in fact, as Your Honor is well aware, likened this to going back thousands of years to things like the Last Supper and biblical times and so forth. That's very different from handing someone a lawn chair or handing someone even a burrito. These are just fundamentally different things going on. What's the line? Because, like, I have this intuitive sense that you're right. But what's the line? Like, how do we decide what is and is not inherently expressive conduct? Yeah, well, so, of course, the doctrinal answer is there has to be a particularized message. And then the reasonable observer would have to take some message, not necessarily the particulars, but some message from it. And then this is a really key point and the reason that I don't think plaintiffs can ultimately prevail on this issue. Rumsfeld makes clear that not only are you not allowed to look at explanatory conduct or expression around it, but if you have to explain what's going on, if you are explaining what's going on, that tends to prove that the reasonable observer is not understanding this inherently as some kind of expression. And I would add to this, I think it basically needs to be a symbol of something. There needs to be some kind of symbolism to it. This is how every Supreme Court case has described it. It's generally how this court has described it. Let me ask you this just about the Rumsfeld sort of point you're making. Does that mean surely – this is a little crass I guess, but shooting someone a bird, that would be expressive conduct. But if you shoot someone a bird and say F you at the same time, it makes it not expressive conduct? No, not at all, Your Honor, not at all. The question is whether the surrounding expression is really necessary to understand the message that's going on. I'd also point out, again, that the crass example of shooting someone the bird, I'm not even sure that that's conduct per se. So this court has, for instance, looked at the question of holding up a fist in protest and said, look, this is expressive conduct at least, but it's probably just speech. And the Supreme Court said the same thing about, for instance, putting peace signs on an American flag and then putting the American flag upside down. They said, look, at the very least this is expressive conduct, but it's probably just pure speech. Why isn't the expressive conduct – I mean why isn't the message that you're standing in line to vote, you're standing in line for maybe a long time, voting is important, and we want to give you a bottle of water to express that. Why isn't that good enough? Well, I think, Your Honor, that that might be the message that some people are trying to get across. I would point out that plaintiffs have been inconsistent even in what message they're trying to get across. Some of them are trying to get across that message. Some of them are trying to protest long lines. Some of them say they're celebrating the civil rights movement. But the question is whether a reasonable observer would inherently take that as the message. And so I think that the question of whether it's inherent or not is, well, the reason we really know that's going on, that we really think you're understanding it that way, is because of the surrounding expression of T-shirts and so forth that's making clear that's the message, as opposed to, for instance, a friend dropping something off with another friend who had forgotten something, or a commercial advertiser just taking advantage of this particular moment to hand out T-shirts or something like that. But given the limited time that I have, I don't think that question is very hard, but I think even easier is the question of just assume there's some kind of modicum of expression here. Burson, Mansky, and Browning make clear that the state has overwhelmingly compelling interests. I will let you get there. Can I ask you one more question, just sort of the blocking and tackling of the Food Not Bombs inquiry? Does there have to be – meeting of the minds is not quite the right way to put it, because I understand your point, which I think is right, is that the subjective intent on the front end. On the back end, it's an objective inquiry. What would the reasonable observer perceive? But does the – on the front end, there's got to be an intent to convey a particularized message. It might be able to be a collection of messages. I don't know. But on the back end, it's got to be a reasonable observer would perceive some message. Yes. Does that some message have to be the same thing that was intended to be communicated, or can it be a different message? I think that it effectively has to be some species of the same thing, because if it's not, then it shows that observers are not taking out of this the thing that people want to put into them. That means there's something inherently expressive about it. But it's kind of meeting of the minds-ish. To some extent, and I don't want to overplay that because I do – the Supreme Court and this court have been clear. It doesn't have to be the kind of the bullet point list of here's all the things we're trying to get across, but it has to at least be, just to use the fist-raising example, this court said it might not be that someone looking at the student raising his fist during the Pledge of Allegiance would understand the exact particulars that he was protesting, a particular punishment that had been handed out for not saying the Pledge of Allegiance, et cetera. But they would take from it a protest message against at least the school or maybe the country or the Pledge of Allegiance generally. What about someone who mistakes a parody? What happens there? Well, I'm not sure. I mean most parodies I would think are involving pure speech, Your Honor, so I'm not sure. But some of them involve some aspect of conduct too. No, absolutely. But I think what we're talking about is the reasonable observer, Your Honor. And that actually goes to one of the points here, is that you don't look at someone with kind of either specialized knowledge or an idiosyncratic view or something. You don't look at like any message is going to be misunderstood by some measure of people, and any message is going to mean slightly different things. You can write an explicit pure speech Word document, here's the message I'm making, and there's no two people that are going to take exactly the same thing from that in all likelihood. No one's denying that the reasonable observer test is a little, you know, it's a legal fiction. But I don't think we look at the kind of the idiosyncratic person who maybe misunderstood the message as opposed to what is the reasonable observer thinking. But one way or the other, I don't see how it can possibly be that the district court correctly understood this 150-foot buffer zone is completely valid, but that the supplemental buffer zone in those rare instances where the line goes past that is somehow invalid. Burson, Browning, Mansky, they all make clear the state has wide authority in this area, very compelling interests, and that the state does not need to... So the buffer zone extends, in your view, I don't want to put words in your mouth, but extends as far as the line goes, even if it goes for five blocks? Yeah, it goes with the line, but that's inherently limited. Boy, that's an extension. Well, it is, Your Honor, but to be clear, it's much less of an extension than just making the buffer zone bigger. And much bigger buffer zones have been upheld by courts across the country. And so in this particular instance, Georgia said, well, rather than expand our buffer zone, you know, as a bubble, let's just follow the line where it goes. So it's inherently limited. And I think the district court got this exactly right. But isn't that the same thing as extending the buffer zone in practical terms? No, not at all, Your Honor. Because if you extend a buffer zone... You just made an immovable buffer zone. Well, but this is the point, Your Honor, is that you're actually going with the voters, right? You're trying to protect the voters. You're not trying to just cover, you know, the world, as it were. So a 600-foot buffer zone, right, covers a ton of area, whereas a 150-foot buffer zone within a supplemental zone that just goes with the voters is about as narrowly tailored a solution as you can have. And Georgia can decide, look, we don't want voting to be a contact sport. We don't want it to be something where people are dissuaded by the kind of rocket atmosphere. We want people to be able to stand in line and be, you know, basically unobstructed. This court has upheld limitations on exit polling, which, you know, has nothing to do with people even walking in on the mere basis that... Doesn't Georgia allow people to step out of the line to get those things outside of a certain distance? Yeah, so this is another way that... So what's the interest then? Well, no, the interest is that's the choice of the voter to step, you know, about eight yards away if they want to, you know, talk to someone or get something. But the voters who are standing in line do not have to worry, A, about people coming up to them, talking to them, handing them things. Don't they also have a chance to say no and not speak to anybody while they're in that extra part of the line? Well, sure, Your Honor, but part of the problem, of course, is that the people who are supposed to be policing this, they are not going to be able to tell from, you know, 50 feet away, 100 feet away, is this something where this voter wants this interaction? Is this something where the voter doesn't want the interaction? Is it legitimate activity? Is it electioneering? Or is it, you know, potentially intimidating or at the very least confusing? And this is, again, I really encourage the court to read the entire history that the Supreme Court goes through in Burson and then repeats in Mansky and this court goes through in Browning. States have been doing this for over 100 years, trying to protect voting lines, and they have overwhelmingly compelling interests in this area. The best way of doing it is to protect the line itself and not expand it beyond that. And I think that that clearly, whatever degree of scrutiny you put here, I think the state passes with flying colors. And the most that you should at all be putting on it would be O'Brien kind of intermediate scrutiny because this is conduct, but at any level we think the state clearly satisfies what's necessary. Can I ask one blocking and tackling question? Hold on one second. Can you give him an extra two minutes, please? We took way off on the first amendment expression issue. Sorry, and it's about to get worse. Actually, I think this is relatively simple. But where does the – in sort of your cascade of arguments, sort of you've got one, that this really isn't expressive conduct to begin with, and one, even if it is, and we get through to scrutiny, we pass. Where does the facial as applied thing kind of fit in the constellation of the arguments? Because on the one hand, it seems like, well, maybe if we don't think this ought to be a facial challenge, that's like sort of a one-page order that says do this again. That doesn't do the circuit much good, I suppose, or the parties really. But where does that fit? Yeah, so I think it fits at least two places. One is there is no way – I don't think anyone says that everyone who's handing an item to a voter in line is expressing something. I mean, maybe someone is making that argument. I don't think anyone is making that argument, which means right off the bat, even if you think that there are certain instances in which this is inherently expressive, it clearly isn't in all instances. And so that would mean that just kind of you already started off on the wrong foot by saying, well, we're just going to treat it all the same. But the second and more important place, I think, that the facial challenge is relevant is let's say that you've decided, and we don't think you should, but you've decided that, well, this is inherently expressive, and we need to decide what's the correct level of scrutiny and go on from there. I think at that point it's incredibly important to do this on an as-applied basis. So let me just give you one example as to why. This court has upheld, as far as I'm aware, basically every buffer zone that's been brought before it. Other courts have upheld 200, 300, up to 600-foot buffer zones. The Supreme Court in Burson said the specifics of like are we doing 200 feet or 100 feet, that's really not a question of constitutional dimension. So even if you think that at some point the line gets so long, and I'm not even saying this would ever happen, but as a theoretical matter the line gets so long that actually the people in the back of the line, they don't deserve this protection. They just don't deserve the same protection as the people in the middle or the front of the line, and the constitutional question is different there. You would have to analyze that question. It makes no sense to say at 151 feet, that's where we're just cutting it off facially from there on, given the Supreme Court's determination that this isn't even really a question for courts. It's kind of like how far are we supposed to be going. The question is really is this just trying to stop this speech in general? Are we just kind of going beyond kind of protecting voters to just trying to stop this speech in general? But at the very least, the court should be looking at this as, okay, well, when does this become unconstitutional? Because it makes no sense to just say across the board that it's unconstitutional. If Georgia had enacted just a 300-foot buffer zone instead, basically every court in the country that has looked at similar zones would have said that's fine. So there's something about the, I think, the relative novelty of a zone that tracks the line that maybe threw the district court off a little bit, but that actually makes it more narrowly tailored and requires more of kind of as-applied challenge as opposed to less narrowly tailored or more of a facial problem. All right, thank you very much. You've saved your full time for rebuttal. Okay, Mr. Roseborough, right? That's right. Good morning and may it please the Court. Gavin Rossborough for the 6th District of the AME Church and Delta Sigma Theta sorority appellees. The district court properly enjoined under the First Amendment, Georgia's law, that criminalized expressive line relief activities to voters standing in lines more than 150 feet from the polling place. When evaluating expressive conduct, whether conduct is expressive, the context is key. Line relief activities occur where precincts with very long lines. Unrebutted testimony in the record of over 20 witnesses shows that plaintiff's activities symbolize solidarity and the importance of civic participation through obstacles, and observers understand, reasonably understand this message. Can I ask you a question? Can you describe for me several forms of action related to line standing that would not be expressive conduct in your mind or under your test? Several forms of action related to line standing, sort of assistance with people standing in line or whatever, that would not qualify for First Amendment protection. And you can see my concern is that everything qualifies. Sure. I think, Your Honor, first of all, selling food and water in line, which would not be expressive, that's not prohibited by SB 202. It's actually, unless they're interfering with election official duties, wherever in the line, somebody could come up properly under Georgia law and sell food or water to someone. So that's an example of a non-expressive activity. It may be that one voter standing in line has a granola bar in their pocket and says, hey, do you want a granola bar? So explain to me why, other than kind of like intuitive sense, like the same question I was asking Mr. Petrani, like what's the line? How do we decide what's in and what's out? How do we decide what's in and what's out in terms of expressive conduct? Well, I think that obviously we have to look at the context, right? And the Food Not Bombs, the first Food Not Bombs case authored by Judge Shorten is a good place to look. And the court has applied that even outside of the food sharing context. So we look, is this on a message of public importance? Yes, long lines in Georgia are notorious. We have testimony here in the record of voters waiting until 2.30 in the morning, six hours, eight hours, long lines stretching on public sidewalks at long distances from the polling places, and groups showing up and providing support and saying, you know, providing food, providing a granola bar, and the record showing that voters, the people standing there receiving this said, I understood that they were telling me the message here is my participation matters. It matters despite obstacles. What about if it were reversed, and instead of being an act of solidarity and support, it was an act of intimidation? So I don't know. Think about Ed Norton in American History X, this sort of disgusting, jacked skinhead standing there, his posse of skinhead standing there to the side sort of punching their fist like this. Is that expressive conduct? And if not, why not? Maybe it is. I think that probably is expressive conduct. I think that's already illegal, despite before SB 0202, that's illegal under numerous provisions of both Georgia and federal law. And are those provisions of Georgia law constitutional? I would think so, because although it involves expression, then we need to look at the actual interests, right? And if the interest here, no one can test that Georgia has a compelling interest in protecting voters from intimidation. The difference here is that that interest is not implicated by people merely offering food and water to people standing in line. There's one item in the entire record that implies some degree of intimidation, and it was a woman. It's a double hearsay example. A woman at a precinct in Albany, Georgia, observing older voters, and she believed that she saw a look of fear on their face because someone wearing a shirt that said Black Voters Matter was handing out a bottle of water. I would say, if anything, we're going to look at what's objectively reasonable and unreasonable in light of the record. That's the unreasonable take. What does the evidence before the district court show about how these items were actually provided? Like how does it work in practice? Right. And, of course, we're talking about with the scope of this preliminary injunction outside of the 150-foot buffer zone, which necessarily means we're dealing with very long lines. Very similar, some people using words, some people not, approaching voters offering food, offering a granola bar, offering some peanut butter crackers, sometimes a company wearing shirts identifying or identifying information that they're with a group like the Deltas or the AME Church or some of the other Georgia NAACP. I guess my question, I haven't taken a look at the entire evidentiary record before the district court, so it's a question in which I'm asking for help. Does a representative of one of these entities or institutions start walking down the line with foodstuffs and water and offering them to anybody who wants them? Do they pick specific points in the line where they might see people who look like they're tired, dehydrated, need help? Is it a combination of both? Does it matter depending on what location we're dealing with? Sure. And I think from the evidence we have in the record of this, and there are several pieces that point to this, this is offered to anyone standing in line, including people who are not voting, kids that are standing with a parent. We have testimony from a witness that said, I was standing with my son who has autism. It was a long line. Somebody provided me, offered me this granola bar, and it gave me hope, and it showed that they thought that my voice was important in the face of obstacles. So most of the evidence we have as it occurs outside of the 150-foot barrier is that. And it's important here, the 25-foot zone matters. We have the defendant saying, well, they can set up more than 25 feet from the line. But like the McMullen case where Chief Justice Roberts recognized that the contact with the voters was part of the expression, that's the same case here. We have lots of evidence in the record saying there's almost, there's very little point in doing this if we have to be so far from the voters. The point is. But doesn't the state have an interest in protecting voters from contact that they don't wish to have? I think, Your Honor, the state has, Burson identified two compelling governmental interests, protecting against voter intimidation and protecting against voter fraud. I think, and I think the Sixth Circuit case, the Lonergan Grimes case, recognizes that the government doesn't necessarily have the same level of interest in just protecting voters from being a voter for who might, the random voter who might be bothered that someone offered them food or water. But I think most importantly, the interests are different here when we're talking about the buffer zone and this unlimited area, which is really important because by putting this 25-foot zone around the voters, it's not, yes, it's important that it could go to unlimited distances. The importance under Burson is that it absolutely shuts off this form of expressive conduct. Let me ask you a geography question if I could. So I'm just imagining in my mind, obviously all of us who voted know how it works. You're standing in line, and then it goes outside the office, and then it just keeps going until – but you've got a 150-foot buffer zone, which apparently nobody is contesting here. I'm imagining you could set it up like Disney World does, like TSA does, where you're going back and forth like that so that you've got a line that is more compact, maybe within the 150-foot buffer zone. And then when you want to extend that line, you could have little stanchions and rope lines that extend out, and voters would be in that. Why are they not – I'm not saying that's how it's done, but I'm just trying to imagine what we're talking about here. Why are those voters who happen to be outside of the 150 feet, why are they any less protectable than those within the 150 feet? Right, and I think, Your Honor, two responses to that, one sort of on the law and one on the facts here. On the law, both in the Mansky case and in Burson, and importantly in Citizens for Police Accountability, the court recognized there is something unique about number one in Mansky being inside the polling place, and in Citizens for Police Accountability that the closer you are to the polling place, the importance of sort of the zone of peace and silence. But Burson, of course, recognizes that it doesn't mean you can shut off speech completely. There becomes a point where it becomes an issue of constitutional dimension. And I will say just here, based on the record, we have testimony from at least four witnesses, both voters and election officials, I think five witnesses at least, that when we're talking about 150-foot lines, they typically do extend onto the sidewalks, onto cross public roads, and it may be that there's a voting site that sort of sets things up that way with a sort of zigzag. But we're really talking about some very long lines, and this is the context in which line relief has occurred. Can I – oh, I'm sorry. Is it okay if I ask a few questions? So one thing you said earlier that I just wanted to circle back to because I think it's a point of disagreement between the parties, you said with respect to what I'll call the second prong of the expressive conduct test, not the intent to convey the particularized message, but some reasonable observer would perceive some message. You said several times we've got record testimony from essentially like our plaintiffs, that they sort of received this message, they felt the solidarity, all of that. I mean the reasonable observer, do you agree that it's an objective test? So I'm not saying that evidence would be irrelevant to it, but it can't be dispositive of it, and wouldn't it necessarily need to travel beyond your plaintiffs to like people in the community or in the surrounding area more generally? Right, and so I think yes to some degree, but if you could just allow me to clarify the record a little bit, Your Honor. We have two observers in the record who are not group members, Hansel Enriquez and Juwan Durbin. Others who were members of the Deltas or the AME Church, it's important that they were not wearing both hats at the same time. These were people through outreach that said, I've experienced this just as a voter standing in line. These aren't people that are both participating in line relief and receiving it. So they have no sort of from an objective perspective, they would have had no reason to receive it differently than other voters. The only two that ended up doing line relief, they did so precisely because they had experienced it. They had been in the long lines and gotten that message and said, I want to give back and do that. And so later on they did that. So I think obviously the court's review, you look at the record as a whole, and the record shows that their understanding of a message is reasonable. There's really nothing to rebut that point in the record. One more question before you sit down, please. You have an objection to the 25-foot zone, right? Yes, Your Honor. Is there any zone the state could set up that you think would be constitutional? I think when you tie it to the voter, it entirely shuts off communication. I mean a yard? I'm sorry? A yard? If the zone is a yard away, I mean that's here to there. Sure. And you're telling me that's – do you think that's unconstitutional too or would be unconstitutional too? No, I'm sorry, Your Honor. Let me clarify. I think any zone which at unlimited distances from the polling places prevents entirely plaintiffs from engaging in that interpersonal contact with voters in line, which the 25 feet does, that's what we think is unconstitutional. If we're talking about one yard, probably not, because you can – most people can reach across that distance. Most people can – you don't really have to step out of line, and you can approach the voters without yelling or distracting them in that way, which would actually be counter to the state's interests of the sort of orderly, peaceful line. So there probably is a place, but given what we're dealing with here today in this particular line-drawing exercise, 25 feet completely shuts off our clients' expressive activities. It is unreasonable. Can I ask one more question? Of course. Can you comment on Judge Newsom's question to your opponent about the facial versus applied issue just briefly, please? Yeah, absolutely. So in the First Amendment context, in the overbreadth context, obviously there's still – facial challenges are not your run-of-the-mill case, right? But the standard is relaxed, and I think as Justice Scalia explained in the – not the Moody case, the Virginia v. Hicks case, it's because of the fear of chilling other speech, right? So there's a little more leg room, and the question is, is this law unconstitutional in a substantial number of applications? And what the record here shows is this is a little different than Food Not Bombs, where we're talking about one group in one city in one park. This is similar conduct expression that happens over the years in different voting locations by a number of different groups. And when we talk about what activity doesn't implicate – is both banned by SB 202 and doesn't implicate free speech rights, there's not a lot. There's not a lot. What SB 202 imposed, all you have to do is look to the text of the law itself, which specifically addresses line relief activities. All right, so a follow-up to Judge Corrigan's question. One, do we have any of that analysis in the record? I mean I think you're right that – look, I learned the hard way in Moody that I didn't do the facial analysis quite right, and so the Supreme Court told me so. So we do need some kind of comparative analysis of invalid applications. Do we have any of that here, or are we just kind of back of the napkinning that now? I think, Your Honor, if you look at the record from the case, which I think obviously this court can affirm on any ground supported by the record, and I think the record as a whole supports that, that there are numerous examples of line relief activities being both targeted and restricted by this. And there's just no examples of – I think you would look at both what does this particular law that's being challenged implicate that's not already illegal, and what is an application of it that doesn't involve speech. And essentially there's no real argument from the other side about that. They point to Salerno. They point to a different test. If you look at the record as a whole, it supports that this is a substantial number of applications. And the alternative, of course, you could affirm as to the clients themselves and remand to determine whether facial relief is also appropriate based on a separate evidentiary hearing. But the district court didn't conduct an over-breath analysis per se, right? I think it's implied in the district court's opinion. The district court looked at all of the evidence before it, which did involve in the first preliminary injunction a full-day hearing involving five witnesses, dozens of other witnesses, deposition testimony, a very extensive record here, and say there's nothing in the record that implies that there are really other applications of this particular portion of the law. So the district court could have probably been more precise in addressing and sort of spelling out how it did that, but I think it's implied in the whole of the opinion. Now that I think about it, now that you're responding to Judge Jordan's question, didn't the district court in this case make precisely the same mistake that I made in NetChoice? I wasn't quite clear enough about the nature of the facial challenge. I didn't sort of do the comparative weighing. So the Supreme Court says, yeah, look, it looks like you're basically right, but you didn't dot your I's and cross your T's. You know what the judgment line says? Vacated. Isn't it exactly the same thing now that I think about it? Your Honor, I do think it's a little different given the extensive findings in the record there, but I would say if we were to look to that, then the proper course would be if we say the district court got it right, but we're not sure about the facial scope of the relief, it would be remanding to address that question. All right. Thank you very much. Thank you very much. Mr. Petrani, you've got to hold on. You've got to hold on. We're not done with the other side yet. Oh, I'm sorry. That's okay. They split their time. We just took him way over his time. How do I pronounce your last name? Encuanta. Encuanta. Whenever you're ready. Good morning. May it please the Court. Uzoma Encuanta on behalf of the Black Voters Matter Fund and New Georgia Project Plaintiff Group. I'd like to start where my colleague left off with respect to the distinction between a facial challenge and an as-applied challenge in the scope of relief. The reason why the facial relief is appropriate in this case, there are two specific reasons. First, because the line relief ban is untethered to the polling place, the polling place which is the site of the state interest that informed the court's decision in Burson, that informed the court's decision in Browning, that informed the court's decision in Mansky. The polling place is the site of the state interest. And here, the supplemental zone is, by definition, untethered to a polling place. So because of that, the number of legitimate applications, the legitimate sweep of this law is extremely limited. And if this court were to actually apply that standard, looking at the unconstitutional application judged in relation to its plain and legitimate sweep, there's very little, if anything, left of the plain and legitimate sweep. You want us to do that on our own without the district court having done it first? Assuming the district court hasn't done it, I don't think the district court did. So as my co-counsel mentioned, the district court may not have been precise, but this court can do that because there are issues here that can be resolved just by looking at the scope of the line relief ban itself. And, for instance, when conducting this examination, the court must exclude or the court should exclude whatever the legitimate applications are that are redundant, that are already prohibited by other laws. Can I ask you a quick question about this since this is a facial challenge? Everything we've been talking about here, the activity in which your clients engaged, was largely sort of food and relief related I'll say, right? Correct. What about the money? Somebody is just standing there just handing out sacks of cash to people in the line. I mean the ban also prohibits the provision of money. How much does that fit into the facial analysis? Yes, it does. And this goes back to my point in determining what the legitimate sweep is. The court needs to exclude or shouldn't necessarily exclude those applications that are already prohibited by other laws. OCGA 21-2-570, the anti-gift rule, that explicitly would prohibit handing out money to voters in line. And that law predates the provision or the specific amendment to the provision that we challenge here. And there's a good reason for that. And the good reason that even this court has recognized for removing sort of redundant laws or eliminating applications that would be prohibited by other laws. And the reason for that is if the court counts those applications that are already prohibited and allows that redundancy, that would just incentivize lawmakers to create redundancy in new laws that have some element that unconstitutionally restricts speech and would allow that redundancy to dwarf the unconstitutional applications. And that way you can insulate just about any law by just building in redundancy. You can insulate any law by building in that redundancy to create and to inflate the legitimate sweep. Can I ask you a practical question, which is sort of guesswork on your part and mine? If you're right in this challenge, aren't you basically asking for the buffer zone to be extended? Not necessarily. In other words, this thing gets struck down, and then the state says, okay, well, can't have a supplemental zone anymore. Let's extend the buffer. And now instead of a 150-foot buffer zone, you've got a 300-foot buffer zone. Well, practically speaking, that is certainly a possibility, but it's likely to be unconstitutional because even the court in Burson recognized that at some point the state's interest in protecting the polling place will be too attenuated in order to enforce these types of restrictions. And the buffer zone in Burson was only 100 feet. And when you start extending that further, you have to justify it. But if, as your side says, the lines in Georgia are long a lot of the time and extend for long distances, maybe that's a justification for extending the buffer zone. Well, that's not an adequate justification because it is, again, untethered to the protection of the polling place and to the elimination of commotion around the polling place. I see that my time is up. May I complete my answer to your question? Of course. These cases, the principle these cases stand for, Burson, Mansi, Browning, is that there is some historical interest in protecting the polling place from commotion. These cases do not stand for the proposition that the state has an interest in protecting voters from speech that can justify unconstitutional restrictions on expressive conduct. In fact, courts have repeatedly rejected the notion that the need to protect individuals from speech is a sufficient reason to restrict other speech. Courts have found it to be paternalistic in some instances. And courts recognize that in order to protect speech, the First Amendment needs breathing room, which means individuals need to be able to tolerate speech, even speech they find unwelcome. Now, the Supreme Court has recognized that there are reasons to prevent that speech when you are near a polling place. And so we are always looking, if we're applying a Burson analysis, we're always looking to the proximity of the polling place, not the proximity of the voter. All right. Thank you very much. I want to address the last point first. The court in Burson, the court in Mansky, the court in Browning and all these other cases is not concerned with protecting concrete and windows. It's concerned with protecting voters. And the reason you have a buffer zone is because you don't want to be in a situation where people get in line to vote and they're accosted by a bunch of confusing, distracting, potentially intimidating things. So that's exactly what Burson was talking about. That's exactly what Browning was talking about. All these cases, they're talking about voters. They're not talking about the building per se. Now, obviously, the further away you get from the voting place, if you just have a radial buffer zone, that's what the court was talking about in Burson. At some point, that gets kind of ridiculous because if you have a 10,000-foot buffer zone around a polling place, the vast majority of that land territory has nothing to do with voting. That's why this particular solution is so well narrowly tailored. Going to the facial versus as applied question, for one thing, the district court clearly didn't even address this question. But second of all, there are numerous reasons why this cannot possibly stand as a facial injunction. One is this is conduct. This court and the Supreme Court have said there's pretty much never going to be a facial injunction against conduct on the First Amendment ground, even if we decided it's expressive conduct, you know, deserving of some protection. Another is, you know, Judge Newsom, you pointed to money, but it's not just money. The entire basis of plaintiff's argument this whole time has been that there's something special about food in particular. But what about, you know, a bubble wand or lawn chairs or a T-shirt or something like that? Are those also unconstitutional, saying we can't hand those out? Or what about 175 feet from the polling place as opposed to 500 feet from the polling place? There are all kinds of questions inherent in there that the district court would at least have to answer. We think there's no way to get to a facial injunction, but at the very least, you have to answer those questions. Well, that leads me to a question that I wanted to ask the other side, but I didn't get to it, but I'm going to ask you. So we're here on a preliminary injunction, right? So my question is, what happens next? What happens if it gets reversed? What happens if it gets affirmed? What's going to be the next step in the case, and what would you envision? Would there be additional evidence? What would you envision differently than what we've already got here? Well, the most important thing is if the preliminary injunction gets reversed is that the state can then enforce these rules. In terms of what's happening next, there has been supplemental discovery. This is a monster of a case, and there's a lot of claims that were consolidated into one, but there has been supplemental discovery that I think the briefing is going to be done sometime in November or December. I think the deadlines have been moved back a few times. And so I think there's some evidence in there, for instance, about what the 2024 lines were like, but I don't think any of that really matters because, at bottom, the evidentiary record here just is not the important thing. And I want to level set again. Berson is talking about the absolute purest, most protected kind of speech, like campaigning. You know, I want you to vote for so-and-so, electioneering, et cetera. That was considered okay for the state to say, you're not allowed to do that here. That is way more protected, way closer to the core of the First Amendment than this kind of conduct. And so what Berson said was the state does not need to provide evidence that it's had voter intimidation concerns. In fact, it would be nearly impossible for the state to do that because the whole problem is you can't identify from 100 feet away or 50 feet away as a poll worker what's going on. Is it valid? Is it invalid? And so all that the state has to do is basically point to these compelling interests that we've identified over the course of 150 years in making sure that voters acting on their solemn duty in this democracy of voting do not need to be pressured, potentially intimidated, distracted. This, Gordon Browning said, just the commotion of exit polling might be enough to kind of dissuade some people from getting into line, and the state is allowed to prohibit that from happening. That's what Berson and Browning and Mansfield are talking about. We are so far removed from that kind of explicit, pure speech here. The idea that the state could somehow have a 300-foot buffer zone prohibiting electioneering, which basically every court in the country has upheld, but can't have a narrowly tailored line zone prohibiting a particular form of conduct just makes very little sense. And to get to the question of, oh, is it tied to the polling place or not, of course it's tied to the polling place. The line is coming out of the polling place. The interests are actually, if anything, stronger the further you get away from the polling place because you have fewer poll workers, fewer kind of security measures like being in the building, for instance. So the idea that somehow, oh, this doesn't have anything to do with voting, we're too far away, that just doesn't wash. And the last point I will make, just on the long line, so we definitely have a disagreement as to how common these lines are, but that's precisely why the narrow tailoring here is so important. You know, you can snake lines back and forth through a parking lot, and most of the time that's going to cover things. And in those few instances where it doesn't, this particular zone kicks in. Georgia can make those determinations. It can protect its voters. And for those reasons, we ask the court to reverse. All right, thank you very much. Mr. Pullman. I have the names right. Mr. Dickey. I have them mixed up here. Sorry, Mr. Dickey, whenever you're ready. Thank you, Your Honor, and may it please the court. Gilbert Dickey on behalf of the Republican appellants. The materiality provision does not displace ordinary ballot casting rules. It applies when a state is assessing whether a voter is qualified, not when the state is assessing whether an already qualified voter has cast a valid ballot. That's why it does not apply to prohibit a state from saying that a voter must fill in a bubble next to a candidate, not circle the candidate's name. And for the same reason, it does not prohibit Georgia from requiring the birth date on the outer envelope of an absentee ballot. Text and context both confirm this understanding. To begin, the materiality provision establishes a rule that applies to errors or omissions in determining whether a voter is qualified. Doesn't the birth date do that? The birth date is another indication that the voter is qualified. Right? No, Your Honor, I don't believe so. So the words to state asking for it then. I think it is an indication that the voter has cast a valid ballot. The ballot, for example, mentioned. The state wouldn't be asking for it if it didn't think that it was relevant to assessing whether the voter was qualified and had cast a valid ballot. Am I just missing something? I think the statute draws a line between the two items you just listed, whether a voter is qualified and whether they have cast a valid ballot. Okay, so tell me why the birth date is important. So the birth date is important because it is one piece of information that can be included with the ballot. That does what? In the statute, it identifies it as identifying information, which is something different from whether. Why is identifying information important? The identifying information confirms that the qualified voter is actually the person who cast the ballot. Then it goes to that same point? No, Your Honor, I don't think it does. And I think when we're assessing, what this statute was doing was regulating state processes. That's what it is referring to when it says indetermining. It means when the state is determining whether a voter is qualified. Voting includes the action necessary to render an effective ballot, does it not? The act of voting includes casting a valid ballot, but an act requisite to voting and voting have to be given different meanings here. And read in context, an act requisite to voting applies to determinations made at the qualification level. And to clarify, you can't have a qualification requirement at the time of the ballot being cast either? A state could not provide for a qualification requirement, no matter how much delay would ensue at the time of casting a ballot. I think theoretically there could be later qualification determinations, but this certainly doesn't qualify, at least in the sense that qualification determination is used in the case of the Civil Rights Act. Because the consequence, I think to determine whether the state is making a qualification determination, you look at what the consequence of the state's decision is. Here, when the state says, you know, you filled out the wrong birth date, they don't send the voter something saying you're not qualified to vote in this election. In fact, they send information on how they can correct the error and get a mulligan. That's not an adjudication that a voter is somehow not a qualified voter to cast a ballot in that election. In fact, that's the same thing when you do the qualification at the front end. You may write in some incorrect information. You may, for example, put in the wrong address. And then when the state sees that your driver's license shows a different address, they're like, well, you're not qualified to vote in that precinct, but your driver's license shows you have this address. If you correct that, then we may be able to give you a voter's ID card. I just think you're splitting hairs about this requirement. I don't think that's correct. And I think there has to be a distinction between qualification determinations that go to whether a voter is, for example, I don't think we would say that, you know, a state is determining whether a voter is qualified when they have,  photo ID rules. You may need, you may need to show that you are actually among the qualified voters who are on the rolls when you show up, but that is not, that's the same thing as showing you're qualified. No, I think the ultimate question is what is the consequence of the decision of the state? Why does consequence, why is consequence the linchpin? Because I think that's what everything else in the statute is directed towards. So it is directed towards application registration or other act requisite to voting. It's not directed to the act of voting itself. And you have to draw the materiality provision provides that no person acting color of law shall deny the right of any individual to vote in an election because of an error or omission or any record in a paper relating to any application registration or other act requisite to voting. The submission of a ballot is the act requisite to voting because until that ballot is received, you haven't voted. I think, I think reading the submission of a ballot here would make no sense under the canon of a use them generous. The other act requisite to voting should be understood in the context of the acts that precede it. Those are an application or registration. The definition of vote in the materiality provision says that the word vote includes casting a ballot that's expressed definition language. So how do you say if it's excluded? So for one thing, I'm not sure that definition actually cuts against us. It's clear when you look to the definition that it draws a distinction between it uses slightly different phrasing, but it says registration or other act prerequisite to voting, which makes it clear that there must be some distinction between casting a ballot and these other items. And I think the more important thing to point out is I'm, I think the Liebert decision is a pretty good illustration of this. At some point, that is the definition of vote, but an other act requisite to voting cannot be defined, cannot continuously be given the same meaning as voting voting and other act requisite to voting have to bear different meanings. Otherwise it's impossible to make sense of the statute. And when you look to the definition of voting, I'm not even sure the other side is saying you can actually just copy and paste that definition into where it says other act requisite to voting in part because it wouldn't make grammatical sense. It, the definition includes all acts necessary to cast a valid vote. And if you just copy and paste this particular definition throughout the statute, everywhere, the word voting appears, it would be other acts necessary all the way down. And we would never actually be able to give the word voting any independent meaning because it would be an other act requisite to any acts necessary to make and any acts necessary to make them. And we just can't make sense of that. And so it's clear that Congress here used the word voting in different context to carry different meanings. This certainly lists the things that they meant to include at various times throughout that, but it also draws a distinction between casting a ballot. And I think reading the language that broadly would not make sense, both because of the used in generous Canon that I was discussing previously, where we know what Congress is talking about here is application and registrations and other acts, other acts requisite to voting. The word other there, the opposing parties have, my friend has said indicates that this is different, but it has to mean different of the same kind. And also we can look to the words in determining that means the state's process. And I think this goes back to your initial question that you started with judge Jordan that refers to a state process of determining, determining whether a person has met the qualifications to be able to cast a  It does not determine whether they have cast a valid ballot that would be counted. The alternative would entirely logically divorce the, what my friends have called the dependent clause, which is a condition is the like rule that applies to these acts here. So I think when we're reading a single sentence, even if it's in a dependent clause, basic rules of ordinary usage require you to read the two together as an entire coherent whole. If you were talking to one of your law clerks and you said, review all, I want you to review all the statutes, legislative history, and other authorities. If you find anything very relevant, please print it for me. You would very relevant and deciding the case, please print it for me. You would probably be surprised if you came in the next day and they had only made it to the second volume of the federal reporter because they were reading all the other authorities. You would understand. Explain that again. I want to know how to tell my law clerks. So I think what I'm trying to illustrate is when, when there's a condition there. So like if you say, I want you to review all the statutes, legislative history, and other authorities. If you find anything you think is helpful in deciding this case, please print it for me. Okay. You would be instructing them to do. You would, you would be instructing them to read the other authorities relevant to the case. You would be surprised if they went to, went into the library and pulled out volume one of the federal reporter and just started reading. That's certainly an other authority in some broad sense, but we, we read statutory language and we understand language and context. And I think you would be surprised and disappointed. If your law courts spent the entire year, just reading the federal reporter to make sure they had covered all authorities. Do you have a position? So I take it. You're you're lined up with the second third circuit. Decision, right? Yes. I, I think the, the Pennsylvania and double ACP decision. Yes. We, we think that decision, the third. In that reading materiality, the materiality provision just doesn't apply in this situation at all. Right. I think the question is in what context does the materiality provision apply? I think the third circuit set out a number of reasons to think it doesn't apply here. One is the, the misfit between the actual rule and the items covered. The other is a use them generous. And also they would be arguing that Congress meant to abolish all sorts of ordinary ballot testing rules, including the example I used with the filling in a bubble versus circling a candidate's name. And these five words in a provision that is otherwise directed to qualification determinations, like registration, but not necessarily limited limited to it. And in a subsection where it's buried between two other provisions that nobody disputes, disputes even though they use very similar language are directed to qualification determinations. If there are no further questions, I'd like to reserve my time for rebuttal. Okay. Thank you very much. Okay. Mr. Fulgham. May it please the court. My name is Lawrence Fulgham. I am counsel for appellees, cross appellants, the Georgia chapter of the NAACP. This appeals about thousands of qualified Georgia voters having their paperwork error, the failure to properly fill in their birth date on the outside of a standardized ballot required by the secretary of state. One might ask what's so hard about reciting your birthday. And the state's witnesses told us that they testified that it's not uncommon for especially older voters and some newer ones to report the current year. That is their birthday rather than the date of their birth. In addition, those representatives of the state have testified or stated that the voters often are uncomfortable, including both the date of their birth and their name on the outside of a ballot return envelope. But just so I'm clear, you don't contend, do you, that an error on this birth date requirement results in the disqualification of a voter, right? I mean, I think I take your brief to say, look, it's only qualified voters who get the absentee ballot in the first place. So everybody here is qualified.  Okay. So you don't, but this is responsive. I think the colloquy that Judge Jordan was having with Mr. Dickey, the result of a failure or this error or omission of the birth date, getting the birth date right does not result in the disqualification of a  That's correct. And it results in the voters vote not being counted, which is the violation of the statute because of a paperwork error, which is the focus of the statute. And if I could refer to the slides that I handed out before, your honor should have them. If not, I can give you another copy. Can I just ask you before you get into your own demonstrative, of course, here is the cascade of arguments that, that, that I think is sort of a raid against your position. And I would just like to get your response to it. This will be a Justice Breyer question. I'll just put it out there. You can respond to it however you want to. So one, the statute uses the words in determining to cover activities where the state is trying to assess whether someone is qualified. Right. Number one, number two, the provisions limitation on records or papers relating to any application, registration, or other act requisite to voting. This is Mr. Dickey's used in generis point. You take the last little catch all clause and filter it through the first two three, that surely an act requisite to voting can't be voting for his reason that it's kind of like at that point it's like an infinite regress or something. It's turtles all the way down for that. It is squished between two provisions that everybody recognizes relate only to qualifications by the extent you have to get beyond the text and look at the history of sort of the purpose of this thing. It was always about registration and application. So it just seems like, boy, there's a lot of rate against your position to say this applies to ordinary ballot casting rules. So if I may address everyone in the context of the statutory language itself because we need to start with the statute and it's going to be determinative. It's on the second page of my handout. We've broken out the relevant points of the statute. I would start at the top instead of as the third circuit starts at the bottom with the tail wagging the dog, which by the way, we're not the only people that disagree with the third circuit. So does the dissent in that case. So does the prior panel in the third circuit. So does half of the Pennsylvania Supreme Court. And so do many other cases that we have cited in the record. So we ask you to consider very carefully whether the third circuit is correct. Starting at the top, the definition of vote is on the right hand of this page. The materiality provisions on the left. No person acting under color of state law shall deny the right of any individual to vote. And what does vote mean? Vote is all encompassing. It is one of those grandiose, starkly grand phrases that just forces refers to as anticipating every possible circumstance. Vote includes all actions necessary to take to make a vote effective. Wow. Including, but not limited to three phases, one registration or other action required to make state law required by state law prerequisite to voting before voting prerequisite to, in addition to that early registration phase, the casting of a ballot itself. Third, making such ballot counted. So the counting of the ballot and included in the appropriate poll to vote cast. Can I ask you a question about this? And maybe you're going to get into this course. If that's, if that's right, then while the specificity and the materiality provision about application, registration prerequisites, I mean, if voting covers all this stuff, I don't know that they could have written a three word statute instead of a reticulated statute. Well, they, they, two reasons. One would be, uh, uh, what justice Souter said in circuit city, which was, um, uh, which is abundance of caution, make sure you're clear and you include everything in there. And so I think when we get into the definition, which is the next sentence of what a, what types of records or papers are included, we're, we're going to answer this question. The, the first, um, uh, point is though, if, if this statute, we're speaking only to denying the right of an individual to register, it would not have included all three phases of voting that it encompasses in its breadth. So the second phrase, the green phrase in the handout, uh, defines the type of paper or record. And it, again, defines that very broadly, even though this statute focuses only on paperwork errors, it doesn't talk about anything else relating to vote casting. It talks about paperwork errors, that's it. And it defines paperwork errors as any record for paper. Do you think a ballot is a record or paper? So, I mean, this is Mr. Dickey's absurdity. I believe it is. Okay. So, so, so. I agree with Judge, uh, Jordan on that. So, so, so then, um, the state cannot exclude a ballot for failure to properly bubble in the thing. Well, no, that, that's not necessarily clear at all. It is a error on a record or paper relating to any application, registration or other requisite to voting. So with respect to that specific example, okay, our position is that a mismarked ballot is not something that the state is, um, required somehow to remark. And explain to me why, given your theory of what this statute means and voting being an all encompassing term. But because that state, once it runs that ballot through the machine has counted the ballot. The fact is it can't count because it is not an effective way of having marked that ballot. Similarly, um, uh, uh, with respect, uh, and secondly, uh, there's room in the statute to accommodate just this position. So the vote has not been denied. The count of the vote has not been denied when you run it through the machine and it doesn't mark it. What about if the poll worker, you know, he takes your little sheet and he says like, well, you didn't do this right trash. So, um, throwing it in the trash, you cannot do, but you cannot, you cannot refuse to count the ballot, but the count would come out the other way if the account is not appropriately tallied in favor of one candidate or another, you would not include it in the, and look at the end of the definition of vote, the appropriate totals of votes passed. If you vote twice, if you circle instead of, uh, uh, square that's not included in the appropriate totals of past. So the statute makes room for what I think is a straw man argument about messing up the counting of ballots here, your honor, um, back to the second phrase. Um, so we know that the statute applies to any paper or record. It relates to any application registration or other act requisite to vote requisite. Now note, it says requisite here, not prerequisite. A requisite must be something other than a prerequisite because the statute uses the word prerequisite and its definition to refer to registration or other action required by state law prerequisite to vote in a requisite is something bigger. It is anything necessary, not something that comes before. This is not about prequalification. This is about any error in the course of voting. Of course, other act requisite to voting also means other, it doesn't mean the same. And the very definition of voting here means requisite to having the ballot counted. It means requisite to, uh, the casting of a ballot. So the definition isn't unclear at all and requisite to voting, um, is broader than voting. Voting is requisite to voting, but so is, and this is the easy thing here for us. Sending in a ballot return envelope required by the secretary of state is an act requisite to voting that ballot. It's very, very clear. We don't need to get too deep into the statute to see that it applies to this specific case of something that the secretary of state requires to be the form that's sent in. So where does, let's get the indeterminate, um, and Judge Newsom's point. So the third clause here, after we've described the paper very broadly, describes what types of errors and omissions are now going to be, um, those that are, um, excludable. This if clause is where we find that if an error or omission is not material in determining whether such individuals qualified under state law to vote. In that case, if it's not material, then the error must be overlooked. And if it is material, then Congress says in its enactment here, you pay attention to materiality. If someone's not qualified, Congress says that is the bedrock, that error we won't overlook. It makes perfect sense that Congress said that because, uh, uh, we don't want somebody who's not qualified to vote casting a ballot. Why isn't it, why isn't material? Why isn't the state's effort to verify that you're who you say you are? Uh, why isn't that material? And this goes back to this court's decision in Schreier, um, and its specific articulation of the purpose of the statute, which was to prevent requesting unnecessary information that would increase the number of errors or omissions. The state can't lard up the process with a bunch of junk it doesn't need. It can't ask you under their point. It can't ask you, as I recall, back in the, back, back in the days, they would ask you how many days you'd been born or something like that to try to, you know, in an obvious effort to help people wouldn't get it right or so forth. But your birth date is a little different than that. Just like your four digit social security or whatever. Um, why? And, and, um, and mail-in ballots are kind of a grace of the state, right? They're, they're, they're trying to make it easier for people to vote. Why isn't it material and permissible for the state to say, we want you to identify yourself by some type of ID and we want, we want you to put your birthday. So your honor asked the question that goes to whether this is material. And I definitely want to address that. I want to first address though your point about the count, the number of days and months in your life, um, their interpretation of the statute would allow the state to ask that on this ballot return envelope. It would allow the state to ask that to you when you go to the poll or any other of a million permutations, it would allow the state to ask you information like, uh, where did you reside prior to your current address? Or, um, what was the year in which you registered to vote? It could ask you any of those things they say during the act of casting a  All right. So let's put that aside in terms of whether this applies to ballot casting. It shouldn't for all those reasons to your specific point. Um, your honor, a, a, we don't dispute that some identification, um, is, uh, material to qualification, but when you've loaded up with additional requirements that aren't required for that identification, that's where we say the line is wrong. And in, in particular here, we, we heard, uh, uh, my colleague make no explanation of why they actually need a birthday. It's not an identifier. It doesn't say who you are. It doesn't unlike a ballot, unlike an ID, for example, in Texas, um, or even the ID, which is also required in Georgia. This is on top of an identification. Now you could say, you know, and many have, the state has, uh, a, uh, strong interest in the integrity of elections and it has interest in making sure that people are who they are. And that's fair enough to a point. It's not a reason or a basis on which the state can step over the line Congress has drawn. The fact that a state has an interest in the integrity of an election does not allow it to put a literacy test on a, on a voter registration request or at the polls. Congress drew lines in the civil rights act. It drew lines on each of the three points that it's in part a, B and C of one or one on one, two. And those are, uh, definitive statements by Congress. You cannot require unnecessary information. We have no explanation for white birthday or any of those other things that could be asked. It might, I'm more likely to know what my prior address was or who else lives at my house. If, if, or, or, and it's registered to vote. The state could ask any of those, um, questions, um, and claim that they were material to, uh, uh, uh, but we're talking about what they did ask in this case. And everybody knows what their birthday is. And I understand somebody can mess it up, but you can also mess up the four digit ID number two. And, and so is it, when you talk about larding it up, I, I agree with you that you can't put on a bunch of things that don't matter, but, uh, is this one of those things? Your honor, they knew when they reinstituted the birthday requirement after the 2020 election, the people messed it up. Their own testimony said that there are thousands of people who aren't getting a chance to vote because of this. And, um, in fact, 74% of the people whose ballots were rejected in Gwinnett County in 2022, in the runoff, for any reason that was identified was because of this, because they didn't put their birthday on there. Now you've got to have some, something more than because I've said so as a rationale for this, this was passed in 2020 after there had been no birthday requirement, um, in the 2020 election, no signature requirement, uh, just an ID requirement. This was added on top of an ID requirement after an election in which their own expert witness testified, there was no evidence of any material fraud, including, uh, in any county. So, um, this is something that was, uh, a solution. And not only in need of no problem, but contrary to Congress's power under Arizona versus, um, the, uh, inter-tribal, uh, council, uh, Justice Scalia held that under article one, section four, when Congress legislates in the space of, uh, the rules for voting in a federal election, and these ballots were thrown out in a federal election. When Congress legislates, its power is paramount and comprehensive. Default is a state controls, but here Congress has exercised his power. It has driven precise lines and it word is our law. We don't get to reinterpret or read the, um, uh, uh, uh, I'm sorry. I didn't mean to interrupt you. No, no, no. I was just going to say, but I think that, that only raises the question. It doesn't answer the question. It raises the question of what does this law mean? And, and so, um, the, the argument that's being made on their side is that we take this, uh, contingent flaw clause, the, uh, uh, the blue clause. And instead of using that as a descriptor of the type of error or omission here, our error omission is determining whether a person is qualified. Good reason for that qualification is preeminent. They want to take that clause and put it in front of the entire provision. If you look at our third slide, it shows what is really the, uh, the impact here. They, they want to take, um, in determining whether such individual is qualified under state law to vote and take, make that clause, which modifies the type of error omission and limit the entire scope of the statute, the entire definition of vote and the inclusion of all other acts requisites of voting. They want to import that language, which modifies the types of errors omission to undermine Congress's entire statutory construction. Another way to look at it. They say that this statute cannot apply to anything other than qualification. But what Congress said in the statute is that this statute applies to every paperwork error that is not related to qualification. It's the opposite of what they're trying to do by the grammatical violence of moving this clause out of place. And it doesn't make sense. So, um, I have, we've taken you way over your time, so I'll give you 30 seconds to wrap up. On the cross appeals, your honor, uh, the state here has an obligation mandated by statute to make sure that counties count votes correctly. And it should have followed that mandatory obligation. And it should have insisted that the counties count the ballots, uh, in accordance with the court order. Second, the state also has a mandatory obligation to issue the form of a ballot envelope, which has this information. The state should have complied with the court's order and not hidden behind some argument. This is all about the counties. We've got nothing. We can do with it. Three prior decisions in 1988, all ordered the secretary of state to stop, uh, doing that, have an entire state stop doing signature validations and, um, stop enforcing the birthday requirement at that time. And it worked. Of course the state was able to get uniform compliance with a court order. We think that's where we should be here. Thank you very much. All right. Thank you. Thank you, your honor. I, I'd like to start with the district the state's interest here and the distinction between identifying and qualification, if I can. And I, can I ask you a quick question before you get going? Um, is he right? So, so everybody recognizes, I think that the materiality provision was born out of this heinous practice of requiring agent days recitations for qualification, right? You know, tell us your, tell us how old you are on the number of days. Nobody could do it. And then that would forgive it on a racially discriminatory basis. Disgusting. Yes, your honor. So under your theory, is he right? That you could require agent days on the, on the ballot envelope. I should say that that would not be prohibited by the materiality provision. So the materiality provision, I think Congress was playing a bit of throughout the entire history of the civil rights movement was a little bit of a game of, you know, congressional whack-a-mole where people would find various practices to evade what Congress had already done very expressly. That's what the civil rights act was doing here where there were a number of ways to evade the materiality provision. So I don't think that the qualification determination stage does not reach the actual ballot testing stage either way. I want to be short answer is yes, we could do that. We, we won't, or it might violate, it might violate some other provision of federal law that I'm not thinking of, but yes, these would be the materiality provision. We could do that. It's certainly not. It's not, we could do that. I think that it might be the latter, which is there are a number of other, but constitutional and statutory prohibitions. Nobody, I, I don't think that that particular argument has been raised until this point in this argument, that that would mean you could do all these other things on ballots. So I don't have an entire list, but that is the upshot. Right. It would mean the materiality provision itself. It reaches to the things covered by the text of the statute, which are qualification determinations. I mean, I don't think that's reading in context. Certainly no, no state should do that. And I think there are various legal provisions. And even frankly, the Anderson verdict test and the prohibition on racially discriminatory practices and voting themselves from the constitution would directly apply to that. But I, I think, you know, the previous, the previous provision applies to discriminatory patterns or practices in qualifying to vote. That would not, that provision does not prohibit a state nobody disputes that a, to a, the proceeding provision banning discriminatory patterns and practice practices and vote in voter registration would apply only at the qualification stage. And it uses very similar language about in determining whether a voter is qualified. So I think we have to, you know, read Congress to do what it was doing. I don't think that is saying, you know, Congress can go for or that the state could go forward and engage in any of those activities. In fact, I, you know, with many of the very specific examples, I suspect it couldn't, but I think that just shows you where Congress's mind was at throughout this time, where they would identify a problem. They developed an extensive legislative record through a commission and they were answering that problem. There could be any other number of problems regulated by other provisions and the constitution. So I think it's sensible to read it that way. And not every provision reaches everything we would like to prohibit. Can I ask you a different question? Are you familiar with recent case from the fifth circuit U.S. versus Paxton? Yes. I believe we filed a 28 J on that case a couple of days ago. I didn't get it, but, but okay. So you're familiar with it. So in that case, Texas, that what they upheld, there was the voter identification information, which George also requires. Do you take that to, do you take that precedent to support you or not support you on that issue? I mean, Texas only requires the ID there. They don't go the extra step and say, okay, now you got to give us your birth date. I mean, I think it absolutely supports this. And that if you look at the opinion, it says, it begins by saying, we find the Pennsylvania NAACP decision persuasive and saying that the materiality provision does not reach ballot casting rules. And so I think that absolutely supports this because that would mean it doesn't apply at this stage. Well, I agree on that point. They just line up with the third circuit, but then they go on to say, and even if that's not it, it's, it's it's material. But the thing they say is material is the ID information. It doesn't, they don't have the separate birth date required. It's not directly on point on that issue, but I think it lends us further support also, because I did want to address the question judge Jordan started with if I can. And I think this ties to that, which is the state is entirely within its right to confirm identification, confirming, identify, and they say that is a purpose of, they identify the birth date as identifying information in the statute. They say, you know, look at the oath and other identifying information at various places throughout the statute. The birth date is one way to do that. I don't read anything in the Paxton decision, which was applying the circuits sort of strange statutory standard for materiality to that question. I don't read anything. They're saying the state is limited to this. The question is, is this, is this material to identification? And if I could just briefly circling back to your distinction between identifying the voter and qualification, I think maybe I, I hope I have one example that can elucidate the distinction we're drawing judge Jordan. I showed the court security officers my bar card when I came into the court, came up to court this morning. I don't think they were assessing my qualifications as a lawyer, the various States and this court's bar are the entities that do that. When I submit my thing. And I think we naturally understand that distinction for that reason. But if you had not showed them your card, would they have allowed you up? They would have allowed me, they would have allowed me up, but as a, as a non-lawyer, they would have allowed me up without my electronic device. That is correct. That's it. You're done. But I would not be removed from the list of this, from the list of attorneys admitted to this court's bar. And I think those are different determinations. Now you're talking about this court's bar, as opposed to the actions of the court security officer, which the example you started with. If that's the example, in my personal view, you're in trouble. So. Because he's the gatekeeper, he or she's the gatekeeper. He's the gatekeeper. And they're the clerk's office, the gatekeeper. So he's the gatekeeper for whether I am able to enter the courthouse and with what items I'm able to enter the courthouse. But I think that's a separate inquiry from whether I'm a qualified lawyer. I will tell you maybe. Maybe not a great example. I have forgotten my bar card at courthouses before and been allowed to enter. And then you often have to arrange that with the clerk's office, and that's a different thing. The point is that your bar card is a way for you to be treated differently, depending on whether or not you produce it. And the same thing with the birth date on a ballot. It lets you be treated differently in the end result of what you're trying to accomplish. When you're trying to get into the courthouse, you're not making the argument you're making in front of us here in this case. Your goal is to get into the courthouse with your equipment as a barred lawyer. So you're prevented from doing that unless you produce the bar card. The person who submits a ballot is trying to get that ballot counted, and Georgia requires him or her to put the birth date on it. And if they don't have the birth date on it, just like you can't get up here with what you want, they can't get the ballot counted like they want. So tell me what I'm missing. I think you're missing that those are ultimately two different questions. Just in ordinary usage, I don't think anybody would say if the court security officer said, well, you forgot your bar card so you have to put your phone up but go on in, would say that they had engaged in a qualification determination and determined that I was not qualified as a lawyer. They might have concluded that I had not completed the steps I needed to be able to enter as a lawyer in this instance. Because you had not shown them that you were a qualified lawyer. I just think it would be extraordinarily strange to say. Just like not accepting a ballot on a given occasion for lack of a birth date doesn't mean for time in memoriam that the voter is ineligible to vote or not qualified to vote. It means that on that specific occasion, if the birth date is not there or is incorrect, that ballot is not going to be counted. In the same way that the court security officer excluding you for lack of a bar card doesn't affect your ultimate qualification as a lawyer, your ability to present an argument here, or your ability to present the bar card at a later point in time at another courthouse for another argument. So I just want to clarify here. It doesn't – in the Georgia example, it doesn't necessarily mean that your ballot won't count. It means you have to go through some additional steps in order for your ballot to count. But I think even in your question, I think you drove a line that shows – and you may think the line is thin, but it illustrates the distinction that they are not – you have to ask what question the materiality provision is directed towards. For all the reasons we've discussed previously today, it's directed towards determining whether somebody is qualified, has met the qualification requirement. Is qualified, right? Not material in determining whether somebody is qualified to vote. And in context with application and registration, it makes an indeterminate referring to a process. It's talking about the process of determining whether a voter is qualified, not whether they have cast a ballot. Much like the court security officer is not engaged in the process of determining whether I'm a qualified attorney, they're engaged in the process of deciding whether I've shown it so that I can enter with different equipment. I think in ordinary usage, we would understand that distinction. I see I'm over my time. We would ask that you reverse. All right. Thank you very much. We're going to take a five-minute break, and then we'll come back for our last two cases. All right.